[Civ. No. 10121. First Appellate District, Division Two.—February 2, 1937.]

WILMA E. BINGER, Respondent, v. PACIFIC GAS AND ELECTRIC COMPANY (a Corporation), Appellant.

Thomas J. Straub, W. H. Spaulding and Clinton F. Stanley for Appellant.

Clifton Hildebrand, James W. Harvey and Goodman, Bachrack & Brownstone for Respondent.

STURTEVANT, J.—From a judgment fixing the amount of damages suffered by the plaintiff for personal injuries the defendant, Pacific Gas and Electric Company, has appealed. The facts on which the verdict rests are as follows: At about 10 A. M. on May 18, 1934—a year and five months before the trial—the plaintiff had just finished taking a bath in her bathroom in her residence at 1728 Tenth Street, Berkeley, California. She had dried herself and taken an alcohol rub after finishing her bath. In the bathroom was an electric heater which stood near the foot of the bathtub. The heater cord was inserted in one of the sockets of a double socket attachment. Into the other socket was inserted one end of an extension cord. The other end

of the cord was inserted in a wire socket in the kitchen whence the heater was energized. The extension cord ran under the locked door of the bathroom. The plaintiff, while standing on the floor of the bathroom, and after she had dried herself, disconnected the extension cord from the socket, holding the cord in her left hand about two and one-half inches from the end. The end flipped back and one of the prongs struck her thumb and two fingers. She received a shock which was so severe that it precipitated her into the bathtub in which remained two or three inches of water. The prong froze to her thumb and fingers as she lay in the water. From the time the prong hit her fingers burning commenced which continued until her mother, hearing her calls, pulled the plug in the kitchen, cutting off the current. The plaintiff was then able to release the prong from her hand. As a result of the electrical current the plaintiff sustained severe burns of the thumb and first and second digits of the left hand and various other contusions and burns and the skin and flesh on, and parts of the bones in her fingers, sloughed off.

On Tenth Street, in Berkeley, the defendant maintains an electric line consisting of poles, crossbars, insulators and wires. The poles are nearly 60 feet high. Some have as many as six crossbars on which there are insulators consisting of a wooden stem with an insulating disc attached. The upper wires carry a single phase 2400 volt circuit of two wires—one hot and one neutral. The lower wires are for distributing and carry a normal circuit of 110–220 volts. Except as hereinafter mentioned there is no claim that said system was improperly constructed or maintained. From the distributing line, wires carrying 120 volts are led into the house of the plaintiff. The plaintiff pleaded, and thereafter offered proof, to the effect that the plaintiff's hand was burned by an excess of voltage negligently allowed by defendant to pass into plaintiff's residence over its secondary wires. It was a conceded fact the secondary wires carried a normal 110–220 volt circuit. ■ However, it was the plaintiff's contention that at the time of the accident a much larger voltage was negligently allowed by the defendant to pass over the secondary wire and cause the injuries which the plaintiff suffered.

Each party depended upon the testimony given by experts. To prove her case the plaintiff introduced evidence to the effect that the burns she suffered could not be produced by a normal 120 volts. She also introduced evidence to the effect that the insulators on the poles in the street supported wires carrying 4,000 volts; that the primary distribution system was by the transformers reduced to 110–220 volts; and that the insulators in use were of limited capacity. She introduced evidence of the particular type and manufacture of the insulators used by the defendant. She also produced the catalogue of the manufacturer showing the capacity of the different insulators and under what circumstances they could be used. That catalogue classified the insulators according to climatic conditions. It did so in the following manner: "(1) Mild—no salt fouling or metallic dust—frequent rains. (2) Normal—ordinary non-saline or metallic dust—seasonal rains—land fogs. (3) Severe—salt fouling or metallic dust—seasonal rains—ocean fog—smoke." For the third class insulators No. 146 (those in use by the defendant) were recommended for a voltage up to 2,200. She also introduced evidence that on the morning of the accident it was foggy. Mr. Crozier, an electrical engineer of much experience, was called and testified that under such weather conditions the current being conducted by the high voltage circuit could and would leak and pass over the wet metal and wood and in and across the minor circuit entering the house. On the other hand, the defendant introduced evidence to the effect that there was not a particle of fog in the neighborhood of the plaintiff's house on the day of the accident; that the humidity was low; and that all of its equipment was and remained dry during the day. It also introduced evidence to the effect that its insulators were abundantly large enough to support its wires and that the current did not leak. Furthermore, it introduced evidence to the effect that a current of 120 volts will, under certain conditions, produce burns such as the plaintiff suffered. Thereupon the defendant argues that the burns suffered by the plaintiff were caused by the normal voltage led into her house and not otherwise, and that the defendant was in no respect negligent.

It will be noted that the strength of the plaintiff's case rested on the contention that when the defendant's trans-

mission lines, insulators, poles, and attachments should become dampened a conductor would be created and the electricity would pass from the highly charged wires down the poles to the lower distributing wires; that on the morning of the accident defendant's apparatus was wet, and she thereupon predicated the claim that said fog dampened the defendant's transmission wires and apparatus, the leak occurred, and the plaintiff was injured by the overflow current.

Among other attacks on the evidence the defendant contends there was no evidence that the defendant's wires, insulators, poles and other apparatus became wet from fog and it shows that it introduced the records of the weather bureau, of ferryboats, etc., to the effect that there was no fog in the general neighborhood of the residence of the plaintiff on the morning the accident happened. The plaintiff makes two replies. She contends that because of the locality the defendant's apparatus had become and was wet. She further contends there was fog on the morning of the accident. She calls attention to evidence to the effect that her residence is in a section where fogs occur when other sections are free, and that, at different times, there are high fogs, low fogs, dry fogs, wet fogs, and ordinary fogs in the neighborhood of plaintiff's residence. At about 10 A. M., May 18, 1934, the plaintiff had taken her bath. She testified that just before she went into the bathroom she noticed it was foggy; as she was taken to the hospital the fog was just beginning to lift; it was what she would call a heavy fog and it continued from 7 until a little after 10 o'clock. Mr. Binger testified that it was quite foggy, just ordinary fog which is there practically every morning. No witness testified that he saw any of the defendant's apparatus, on the morning in question, enmeshed in fog in whole or in part. But, under the facts recited above we think it is clear this court is not entitled to state, as a matter of law, that there was no evidence showing the defendant's apparatus was not wet and dampened as the plaintiff contends.

On the trial there was some evidence in which the voltage was inexactly expressed—sometimes the primary circuit was referred to as a 4,000 volt circuit, and sometimes as a two wire 2400 volt single phase circuit. That confusion arose

with reference to the meaning of the terms used in the catalogue. However, the use of the catalogue in this case was but one circumstance. As we understand his testimony, Mr. Crozier testified that the specific insulators were insufficient to carry the load being carried by the defendant over its wires at the place of the accident.

In its next point the defendant makes the claim that its insulators met the calls of the catalogue and therefore the plaintiff's case must fall. An examination of the record discloses that plaintiff's case did not rest wholly on the recitals contained in the catalogue, but on the other hand it was the plaintiff's claim that her case was strengthened by reason of the recitals contained in the catalogue. In this behalf we understand Mr. Crozier's testimony to be about as follows: "With the poles and the crossarms and everything covered with moisture the current would follow down the wires and into plaintiff's house. Assuming that it was a foggy morning the current would leak over the side of the insulators. The leakage followed the surface. It would come over the sides of all of them. When it got to the lower edge of the insulator it continued to follow the surface, which would also be wet. The current would then pass into the pin which is a distance of about five and a quarter inches. Whether the insulators and pins are wet or dry there is a leakage current over the insulators at all times. That is so as to all insulators at all times. There is a certain amount of leakage. The pin is·wood and there is no metal around it at all. The current follows the moisture in the wood. The normal condition of the crossarms in a region that is subject to severe fogs would be moist. That is something that actually happens."

The defendant earnestly contends the plaintiff's injuries could have been caused by 120 volts and that her proof did not show that the current leaked from the primary circuit to the distributing circuit and therefore that the defendant is not liable. It is sufficient to state that in the record there is a large amount of evidence to the effect that the plaintiff's injuries could not have been caused by a current of 120 volts.

The last point made by the defendant is that if the plaintiff was injured in the manner contended by her, then it must follow that other leakage at other times must have

34

taken place. The argument is persuasive, nevertheless there was direct evidence that the conclusion contended for does not necessarily follow from the facts.

The evidence introduced contained numerous conflicts. As recited above, the case made by the plaintiff and the case made by the defendant each rested largely on the testimony given by expert witnesses. In the case entitled *Mah See* v. *North American Acc. Ins. Co.*, 190 Cal. 421, at page 426 [213 Pac. 42, 44, 26 A. L. R. 123], the court announced the rule as follows: ". . . even though all the facts are admitted or uncontradicted, nevertheless, if it appears that either one of two inferences may fairly and reasonably be deduced from those facts, there still remains in the case a question of fact to be determined by the jury . . . and . . . the verdict of the jury . . . cannot be set aside by this court on the ground that it is not sustained by the evidence". So in the instant case we think it may not be said that the jury was not warranted in inferring that the current was negligently allowed to leak from the primary circuit to the distributing circuit.

The judgment is affirmed.

Nourse, P. J., and Spence, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 1, 1937.